No. 25-3089

IN THE UNITED STATES COURT OF APPEALS

FOR THE SEVENTH CIRCUIT

QUINTEZ CEPHUS,

Plaintiff-Appellant,

v.

REBECCA BLANK, et al.,

Defendants-Appellees.

ON APPEAL FROM A JUDGMENT ENTERED IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WISCONSIN, THE HONORABLE WILLIAM M. CONLEY, PRESIDING

# BRIEF OF DEFENDANTS-APPELLEES

JOSHUA L. KAUL
Attorney General of Wisconsin

RACHEL L. BACHHUBER
Assistant Attorney General
State Bar #1052533

Attorneys for Defendants-Appellees

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0188
(608) 294-2907 (Fax)
rachel.bachhuber@wisdoj.gov

## TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ........................................................ 1

INTRODUCTION ........................................................ 2

STATEMENT OF THE ISSUES ........................................................ 3

STATEMENT OF THE CASE ........................................................ 5

I. Statement of the facts. ........................................................ 5

A. The University of Wisconsin–Madison's Title IX framework and governing procedures. ........................................................ 5

B. The allegations and the University's investigation. ........................................................ 6

C. The initial, amended, and final investigative reports ........................................................ 8

D. The initial findings and recommendation. ........................................................ 11

E. Attempts to schedule the nonacademic misconduct hearing. ........................................................ 11

F. The nonacademic misconduct hearing and appeals. ........................................................ 14

G. The criminal trial and petition for restoration to the University. ........................................................ 16

H. Other litigation. ........................................................ 17

II. Procedural background. ........................................................ 18

SUMMARY OF THE ARGUMENT ........................................................ 20

ARGUMENT ........................................................ 21

I. The district court acted well within its discretion by enforcing its local procedures and declining to consider facts presented outside the required proposed findings of fact procedure. ........................................................ 21

II. The district court properly exercised its discretion in excluding Cephus's exhibits that he failed to disclose during discovery. ..... 25

III. Cephus's Title IX claim fails because he did not present evidence of sex discrimination. ..... 31

A. The district court's decision granting summary judgment is reviewed de novo. ..... 32

B. Title IX requires evidence of sex discrimination. ..... 33

C. Cephus's external pressure and campus climate theory fails because there is no evidence of sex bias particular to his case. ..... 35

1. Cephus's rescinded federal guidance theory fails. ..... 36

2. Cephus's campus climate and media pressure theory fails. ..... 38

D. The alleged procedural irregularities were not irregularities at all and Cephus never ties them to his sex. ..... 40

1. Proceeding during the criminal case was neither irregular nor evidence of sex discrimination. ..... 41

a. The University's duty to promptly resolve complaints of sexual violence is not evidence of sex discrimination. ..... 42

b. Cephus's choices about what evidence to provide to the University is not evidence of sex discrimination. ..... 44

c. Cephus offers no legal support for his position that he was "unable to provide exculpatory evidence" to the University before his acquittal. ..... 46

2. The University scheduled the hearing to accommodate Cephus's chose advisor and did not deny his participation. .................................................. 50

3. The University did not "bow" to pressure from complainants and instead made accommodations for both sides........................................... 52

4. Allowing Complainant 2 to review Complainant 1's statement was not sex discrimination. ................................................................... 54

5. Cephus has no evidence the University presumed him guilty.......................................................... 56

6. Cephus was not denied the opportunity to cross examine the complainants.................................................. 58

7. The totality of the circumstances fails to show sex discrimination.............................................................. 61

CONCLUSION........................................................................................... 63

## TABLE OF AUTHORITIES

### Cases

*Abstract & Title Guar. Co. v. Chicago Ins. Co.*,
489 F.3d 808 (7th Cir. 2007) .......... 30

*Ammons v. Aramark Unif. Servs., Inc.*,
368 F.3d 809 (7th Cir. 2004) .......... 21

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 32

*Arana v. Bd. of Regents of Univ. of Wisconsin Sys.*,
142 F.4th 992 (7th Cir. 2025) .......... 17–18

*Brady v. Maryland*,
373 U.S. 83 (1963) .......... 45

*Chevron Corp. v. Pennzoil Co.*,
974 F.2d 1156 (9th Cir. 1992) .......... 28

*David v. Caterpillar, Inc.*,
324 F.3d 851 (7th Cir. 2003) .......... 25

*Doe v. Board of Regents of the Univ. of Wis. Sys.*,
615 F. Supp. 3d 877 (W.D. Wis. 2022) .......... 17

*Doe v. Columbia Coll. Chicago*,
933 F.3d 849 (7th Cir. 2019) .......... 33, *passim*

*Doe v. Ohio State Univ.*,
219 F. Supp. 3d 645 (S.D. Ohio 2016) .......... 45

*Doe v. Purdue University*,
928 F.3d 652 (7th Cir. 2019) .......... 35

*Doe v. Trs. of Ind. Univ.*,
101 F.4th 485 (7th Cir. 2024) .......... 34, 35, 57–58

*Doe v. Univ. of S. Ind.*,
43 F.4th 784 (7th Cir. 2022) .......... 34, 46, 51, 59

*Does 1-2 v. Regents of the Univ. of Minnesota*,
999 F.3d 571 (8th Cir. 2021) .......... 48

*FKFJ, Inc. v. Vill. of Worth*,
11 F.4th 574 (7th Cir. 2021) .......... 32

*Frakes v. Peoria Sch. Dist. No. 150*,
872 F.3d 545 (7th Cir. 2017) .......... 21

*Garcia v. Zenith Elecs. Corp.*,
58 F.3d 1171 (7th Cir. 1995) .......... 28

*Gash v. Rosalind Franklin Univ.*,
117 F.4th 957 (7th Cir. 2024) .......... 34, *passim*

*Hart v. Ferris State Coll.,*
557 F. Supp. 1379 (W.D. Mich. 1983) .......... 47

*Hedrich v. Bd. of Regents of Univ. of Wis. Sys.*,
274 F.3d 1174 (7th Cir. 2001) .......... 22, 23, 24

*Hickman v. Tayor*,
329 U.S. 495 (1947) .......... 28

*Metzler v. Loyola Univ. Chicago*,
164 F.4th 612 (7th Cir. 2026) .......... 33, *passim*

*Midwest Imports, Ltd. v. Coval*,
71 F.3d 1311 (7th Cir. 1995) .......... 24

*Millspaugh v. Cnty. Dep't of Pub. Welfare of Wabash Cnty.*,
937 F.2d 1172 (7th Cir. 1991) .......... 45

*Musser v. Gentiva Health Svcs.*,
356 F.3d 751 (7th Cir. 2004) .......... 30

*Nzuve v. Castleton State College*,
335 A.2d 321 (Vt. 1975) .......... 47

*Pond v. Michelin N. Am., Inc.*,
183 F.3d 592 (7th Cir. 1999) .......... 48, 52

*Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*,
32 F.3d 851 (3d Cir. 1994) .......... 28

*Salgado v. Gen. Motors Corp.*,
150 F.3d 735 (7th Cir. 1998) .......... 25

*Schwake v. Arizona Board of Regents*,
967 F.3d 940 (9th Cir. 2020) .......... 40

*United States ex rel. Landis v. Tailwind Sports Corp.*,
317 F.R.D. 592 (D.D.C. 2016) .......... 29

*United States v. Banas*,
712 F.3d 1006 (7th Cir. 2013) .......... 30

*United States v. Bilzerian*,
926 F.2d 1285 (2d Cir. 1991) .......... 28

*United States v. Procter & Gamble Co.*,
356 U.S. 677 (1958) .......... 30

*Waldridge v. Am. Hoechst Corp.*,
24 F.3d 918 (7th Cir. 1994) .......... 22, 23, 24

**Statutes**

20 U.S.C. § 1092(f)(8)(B)(iv)(I)(aa) .......... 42

20 U.S.C. § 1232g .......... 55

20 U.S.C. § 1681(a) .......... 1, 33

28 U.S.C. § 1291 .......... 1

28 U.S.C. § 1331 .......... 1

28 U.S.C. § 1367 .......... 1

42 U.S.C. § 1983 .......... 1, 18

Wis. Stat. § 971.23 .......... 45

**Rules**

Fed. R. App. P. 4(a)(1)(A) .......... 2

Fed. R. Civ. P. 33(b)(3) .......... 26

Fed. R. Civ. P. 33(d) .......... 26, 27, 29

Fed. R. Civ. P. 34(a), (b)(2) .......... 27

Fed. R. of Civ. P. 37(c)(1) .......... 4, 19, 21, 25, 30

Fed. R. Civ. P. 56(a) .......... 32

Fed. R. Evid. 804(b)(1)(B) .......... 19

**Regulations**

34 C.F.R. Part 668 .......... 31

34 C.F.R. § 668.46(b)(1), (b)(11), (c) & (j) .......... 39

34 C.F.R. § 668.46(b)(11)(v) .......... 57

34 C.F.R. § 668.46(k) .......... 31, 42

34 C.F.R. § 668.46(k)(2)(i) .......... 53

34 C.F.R. § 668.46(k)(2)(iv), (3)(i)(B)(3) .......... 43

34 C.F.R. § 668.46(k)(iii) .......... 57

34 C.F.R. § 99.37 .......... 55

34 C.F.R. § 99.31(a)(11) .......... 55

79 Fed. Reg. § 62783–90 (Oct. 14, 2014) .......... 31

79 Fed. Reg. § 62785 .......... 39, 57

79 Fed. Reg. § 62789 (Oct. 20, 2014) .......... 31, 43, 57

79 Fed. Reg. (Oct. 20, 2014) .......... 31, Passim

**Administrative Code**

Wis. Admin. Code UWS ch. 17 .......... 5

Wis. Admin. Code UWS § 17.11(4)(c) .......... 11, 42, 43

Wis. Admin. Code UWS § 17.12(2) .......... 11, 42, 43

Wis. Admin. Code UWS § 17.12(4)(c)(3) .......... 58

Wis. Admin. Code UWS § 17.13(2) .......... 42, 43

## JURISDICTIONAL STATEMENT

Plaintiff-Appellant Quintez Cephus's amended jurisdictional statement is not complete and correct. A complete and correct statement follows.

The district court had jurisdiction under 28 U.S.C. § 1331. Cephus filed a complaint alleging a claim against Defendant Board of Regents of the University of Wisconsin System (the "Board") under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a). (Dkt. 1 ¶¶ 14, 272–288.) He also alleged claims against Defendants Rebecca Blank and Lauren Hasselbacher under 42 U.S.C. § 1983 for alleged violations of the Fourteenth Amendment. (Dkt. 1 ¶¶ 239–271.) And he alleged two state law causes of action for breach of contract, and estoppel and reliance, against the Board, over which the district court had supplemental jurisdiction under 28 U.S.C. § 1367. (Dkt. 1 ¶¶ 289–300.)

This Court has jurisdiction under 28 U.S.C. § 1291. The district court entered an opinion and order granting the Board's motion for summary judgment on October 30, 2025. (Dkt. 72.) The court entered a final judgment in favor of Defendants the same day. (Dkt. 73); 7th Cir. R. 28(a)(2)(i). Cephus did not file a motion for a new trial or alteration of the judgment, or any motion claimed to toll the time within which to appeal. *See* 7th Cir. R. 28(a)(2)(ii)–(iii).

Cephus filed a timely notice of appeal on November 19, 2025. (Dkt. 75); Fed. R. App. P. 4(a)(1)(A); 7th Cir. R. 28(a)(2)(iv). This case is not a direct appeal of a magistrate's decision. *See* 7th Cir. R. 28(a)(2)(v).

## INTRODUCTION

This case does not present a close question under Title IX, but it presents a familiar one: whether alleged imperfections in a university disciplinary process—combined with generalized concerns about campus climate—permit an inference that the outcome was driven by sex. Here, they do not.

The University of Wisconsin–Madison investigated complaints that one of its students, Quintez Cephus, engaged in sexual misconduct and adjudicated those complaints under established procedures. Cephus participated through counsel, received the evidence against him, submitted his own materials, and posed questions to the complainants at a hearing. After that process, the University found him responsible and imposed discipline. Months later, after Cephus obtained additional information through his criminal case, the University revisited that decision and reduced the sanction.

Cephus does not identify evidence that any decisionmaker acted unlawfully because he is male. Instead, he challenges how the University conducted its process. He argues the University should have delayed the proceedings during his criminal case, and handled the hearing, evidence, and

witness examination differently. He also points to generalized campus pressure and awareness efforts. But Title IX does not authorize courts to second-guess decisions on those grounds. It prohibits discrimination on the basis of sex.

This Court has made that distinction clear. Procedural errors—even significant ones—do not establish a Title IX violation unless they are tied to sex. Nor do generalized pressures, pro-complainant bias, or ordinary administrative judgments. What matters is whether the evidence permits a reasonable inference that sex caused the outcome. On this record, it does not.

The district court correctly enforced its local procedures, excluded undisclosed evidence, and evaluated the record as a whole. It concluded that Cephus's allegations, taken together, do not even "begin to show bias against him because of his sex." (Dkt. 72:31.)

At bottom, Cephus alleges an unfair process. But Title IX requires more. Because no reasonable factfinder could conclude that the University discriminated against him on the basis of sex, the judgment should be affirmed.

## STATEMENT OF THE ISSUES

1. The district court's summary judgment procedures require all facts to be presented in separately filed proposed findings of fact. The court expressly warns that facts contained only in a brief will not be considered. Cephus did not file any additional proposed facts and instead relied on

evidence introduced only in his brief. Did the district court appropriately exercise its discretion when it excluded the evidence Cephus cited only in his brief?

2. Under Federal Rule of Civil Procedure 37(c)(1), a party may not rely on evidence that should have been disclosed in discovery on any motion unless the failure was substantially justified or is harmless. On summary judgment, Cephus's arguments relied on evidence he failed to disclose in response to Defendants' discovery requests and at his deposition. Did the district court appropriately exercise its discretion when, at summary judgment, it excluded the evidence Cephus failed to disclose during discovery?

3. Title IX prohibits sex discrimination and the implementing regulations require universities to promptly investigate and adjudicate complaints involving student-on-student sexual misconduct. Here, two students filed a complaint with the University alleging they were sexually assaulted by Cephus. Cephus was criminally charged for the same conduct. The University investigated the complainants' allegations, gave Cephus multiple opportunities to provide evidence, and made decisions based on the available evidence. After an evidentiary hearing, the University found Cephus responsible for sexual misconduct and expelled him. After his acquittal in the criminal case, he petitioned the University for readmission based on newly

available evidence. The chancellor granted his petition, and he was readmitted. Did the Board discriminate against Cephus on the basis of sex?

## STATEMENT OF THE CASE

### I. Statement of the facts.

#### A. The University of Wisconsin–Madison's Title IX framework and governing procedures.

The Board of Regents governs the University of Wisconsin–Madison ("UW–Madison" or "University"). During the events at issue, Rebecca Blank served as Chancellor, and Cephus was a student and member of the University's football team during the 2017–18 academic year. (Dkt. 64 ¶¶ 2, 6, 41.)

As a recipient of federal funding, the University implements Title IX through enforcement of its policy on Sexual Harassment and Sexual Violence (January 2018). (Dkt. 64 ¶ 25; 47-1.) When the respondent to a complaint is a student, the policy directs the University to follow the procedures set forth in Wisconsin Administrative Code chapter UWS 17, which governs student nonacademic misconduct proceedings. (Dkt. 64 ¶ 26; 47-2.)

UWS 17 establishes the process the University must follow before imposing discipline, including investigation, notice, and hearing procedures. (Dkt. 64 ¶ 27; 47-2.) In matters involving allegations of sexual harassment or assault, the Title IX Coordinator participates in that process. (Dkt. 64 ¶ 27.)

At the time, Lauren Hasselbacher served in that position. (Dkt. 64 ¶ 10.)

### B. The allegations and the University's investigation.

In April 2018, two students reported that Cephus sexually assaulted them during an off-campus encounter and that his teammate—referred to as Teammate 2—photographed them nude without consent. (Dkt. 64 ¶¶ 32–33, 60–61.) The University issued no-contact directives and initially lacked sufficient information to open a formal investigation. (Dkt. 64 ¶¶ 37–40,
43–46, 48.)

At the same time, a parallel criminal investigation began. (Dkt. 64 ¶¶ 48–49.) Law enforcement referred charges to the Dane County District Attorney's Office, which the University learned of in May 2018. (Dkt. 64 ¶ 49.) As additional information became available—including a written statement from Complainant 1 and confirmation from Complainant 2 that she believed she had been sexually assaulted—Hasselbacher determined that the University had sufficient information to proceed. (Dkt. 64 ¶¶ 51–54, 56–57.)

The University issued Cephus a Notice of Charge on May 29, 2018, followed by an amended notice identifying potential violations under UWS 17, including second degree sexual assault, third degree sexual assault, violation of criminal law, and sexual harassment of both complainants. (Dkt. 64

¶¶ 57–61.) The University invited Cephus to submit a written response, identify witnesses, and provide any evidence he believed relevant. (Dkt. 64 ¶ 62.) All parties were represented by counsel throughout the investigation.[1] (Dkt. 64 ¶¶ 65–68.)

Over the next four months, the University conducted a thorough investigation. (Dkt. 64 ¶¶ 69–70, 84.) Hasselbacher interviewed witnesses and collected the available evidence, including surveillance footage, text messages, social media communications, notes from review of the UW-Madison police report, the criminal complaint, and a redacted record of Complainant 1's forensic nursing examination. (Dkt. 64 ¶¶ 69–70, 84.) During that time, the University repeatedly invited Cephus to participate in an interview or submit additional evidence. (Dkt. 64 ¶¶ 64, 72, 75–77, 90–91, 95, 98–99, 107–108; 47-13.)

Cephus, through counsel, provided limited materials but did not sit for an interview. (Dkt. 64 ¶¶ 80–81, 110.) Although his attorneys referenced potentially exculpatory evidence in law enforcement's possession, the City of Madison Police Department declined to release investigative materials during the ongoing criminal case. (Dkt. 64 ¶¶ 75, 88.) The University nevertheless

[1] Although Teammate 2 was not a party to Cephus's disciplinary proceeding, he was also represented during the investigation. (Dkt. 64 ¶ 67.)

continued its investigation using the information available to it. (Dkt. 64 ¶¶ 69–70, 84.)

The University also accommodated scheduling requests from Cephus's counsel, including rescheduling a planned interview. (Dkt. 64 ¶ 98.) After criminal charges were filed in August 2018, Cephus declined to proceed with the rescheduled interview. (Dkt. 64 ¶¶ 100–01, 110.) His counsel instead requested that the University delay its investigation pending the outcome of the criminal case, citing unspecified "critical evidence" that might later emerge. (Dkt. 64 ¶ 106.)

The University declined to delay. (Dkt. 64 ¶¶ 111–13.) It explained that Title IX requires a prompt and independent investigation regardless of parallel criminal proceedings and that law enforcement would not provide additional information during the pendency of the case. (Dkt. 64 ¶¶ 112–13.)

### C. The initial, amended, and final investigative reports.

On August 31, 2018, Hasselbacher circulated a draft Initial Investigative Report to the parties and invited comments. (Dkt. 64 ¶ 114.) Cephus requested an extension to respond, and the University granted a shortened extension. (Dkt. 64 ¶ 115.)

The parties then submitted written responses and additional materials. (Dkt. 64 ¶¶ 116–22.) Complainant 2's counsel declined to propose changes but objected to Cephus's and Teammate 2's participation. (Dkt. 64 ¶

116.) On September 11, Teammate 2 submitted a written statement, which the University shared with all parties. (Dkt. 64 ¶¶ 117–18, 120, 122.) On September 13, Cephus submitted a written response and attached his written statement (dated September 14), his criminal motion to dismiss, an attorney affidavit, and an exhibit. (Dkt. 64 ¶ 121; 47-21:5–7.)

As additional information became available, the parties continued to supplement the record. (Dkt. 64 ¶¶ 123–24.) On September 20, Cephus's counsel provided video evidence to the University—a PowerPoint presentation with video of the parties' leaving Cephus's apartment building. (Dkt. 64 ¶ 123.) Also on September 20, the Dane County District Attorney's office provided Cephus's counsel, Attorney Meyer, discovery in the criminal case. (Dkt. 64 ¶ 124.) The discovery comprised over two hundred pages of documents and 9 CD/DVDs. (Dkt. 64 ¶ 124.) The District Attorney's office also told counsel that videos, audio, and photographs could be made available for viewing. (Dkt. 64 ¶ 124.)

University counsel confirmed that Cephus's written statement denying the allegations and claiming the encounter was consensual would be included in the final report and that the University would decide the matter based on the information gathered. (Dkt. 64 ¶¶ 125–27.) Counsel also explained that the University could not compel participation, could not draw adverse inferences from a respondent's silence, and was required to proceed

with its Title IX process despite parallel criminal proceedings. (Dkt. 64 ¶¶ 127–29.)

The University issued amended versions of the investigative report and continued to invite comments from all parties. (Dkt. 64 ¶¶ 132–34.) Complainant 2's counsel repeatedly objected to Cephus's ability to review and respond to the report. (Dkt. 64 ¶¶ 133, 142.) Despite those objections, the University continued to share draft reports with him and incorporate his submissions. (Dkt. 64 ¶ 134.) Complainant 2's counsel also complained about Cephus's presence on campus, claiming Complainant 2 "suffered every day that she is on campus with knowledge Respondents are on campus." (Dkt. 64 ¶ 135.) Cephus was not removed from campus at that time. (Dkt. 64 ¶ 136.)

The parties continued to submit materials in response to successive drafts. (Dkt. 64 ¶¶ 137–40.) Teammate 2 provided an additional statement, Complainant 1 submitted medical records, and Cephus submitted another written statement, dated October 6, while again requesting that the investigation be delayed. (Dkt. 64 ¶¶ 137–40.) Cephus later testified that he was not aware of any court order in his criminal proceeding preventing him from providing information during the investigation. (Dkt. 64 ¶ 141.)

On October 9, 2018, Hasselbacher, issued the Final Investigative Report, transmitted it to the Office of Student Conduct, and notified all parties. (Dkt. 64 ¶¶ 143–44.) Hasselbacher did not make credibility determinations or

findings but instead presented the collected information without opinion. (Dkt. 64 ¶ 145.) The Office of Student Conduct, not Hasselbacher, ultimately made the initial findings and recommended sanctions. (Dkt. 64 ¶ 145.)

That same day, Cephus filed a federal lawsuit seeking to enjoin the University's disciplinary process. (Dkt. 64 ¶ 147; 47-33.) No injunction issued, and Cephus later voluntarily dismissed the case. (Dkt. 64 ¶ 148.)

### D. The initial findings and recommendation.

The University assigned Assistant Dean Ervin "Kipp" Cox to issue the initial findings and, if necessary, recommend a sanction based on the Final Investigative Report. (Dkt. 64 ¶ 149.) After reviewing the report and evidence, Cox issued written findings on October 30, 2018. (Dkt. 64 ¶¶ 149–51.) Cox found Cephus responsible for third-degree sexual assault and sexual harassment as to both complainants and responsible for second-degree sexual assault only as to Complainant 2. (Dkt. 64 ¶¶ 152–54.) Cox did not find Cephus responsible for any criminal law violation. (Dkt. 64 ¶ 155.) Cox recommended expulsion. (Dkt. 64 ¶ 156.)

### E. Attempts to schedule the nonacademic misconduct hearing.

Because expulsion was recommended, UWS 17 required a nonacademic misconduct hearing. (*See* Dkt. 47-2 (Wis. Admin. Code UWS §§ 17.11(4)(c), 17.12(2)).) The day after issuing the finding letters, Cox contacted

Cephus's counsel to begin scheduling and explained the timing requirements: the hearing was supposed to be scheduled within 15 days and ordinarily held within 45 days of issuance of the finding letters, unless all parties agreed otherwise. (Dkt. 64 ¶¶ 160–62.) In Cox's October 31 email, he offered five proposed hearing dates to Cephus's attorneys. (Dkt. 64 ¶ 160.)

Over the next several weeks, Cox repeatedly contacted Cephus's attorneys to schedule the hearings and attempted to accommodate the scheduling limitations asserted by Attorneys Bernstein and Miltenberg. (Dkt. 64 ¶ 163.) Cox emailed Cephus's counsel on November 8 and again on November 9, to try to schedule the hearings in early December. (Dkt. 64 ¶ 164.)

On November 12, Attorney Bernstein requested that the hearing be postponed until the next year. (Dkt. 64 ¶ 165.) Cox accommodated that request and proposed multiple January 2019 dates—including January 15—and asked counsel to hold those dates. (Dkt. 64 ¶¶ 165–66.) Counsel responded that they would review the dates with Cephus and provide their preferred dates.

(Dkt. 64 ¶ 168.) When Cox later followed up to confirm counsel's availability for January 14, 15, 16, and 18, counsel did not respond. (Dkt. 64 ¶¶ 169–70.)

After receiving no response, on December 5, Cox emailed Cephus's counsel to inform them that he had scheduled separate hearings for January 14 and 18, 2019, to accommodate the parties and avoid conflicts with the spring

academic term. (Dkt. 64 ¶ 171.) At that time, the intention was to hold separate hearings on the charges related to each complainant. (Dkt. 64 ¶ 171.) Cox had also been able to arrange a hearing committee to decide the matter for those dates. (Dkt. 64 ¶ 171.)

In response, Bernstein emailed Cox that he and Miltenberg had a conflict for January 11, 12, 14 and 24. (Dkt. 64 ¶ 172.) Cox responded that same day and accommodated Cephus's counsel by moving the January 14 hearing to January 15, with January 16 as another option if needed. (Dkt. 64 ¶ 173.) Cox asked Bernstein to confirm he or one of the other attorneys could participate on January 15. (Dkt. 64 ¶ 173; 49-2:2.) When no response followed, Cox emailed Bernstein and Miltenberg on December 11 that the hearings would be scheduled for January 15 and January 18. (Dkt. 64 ¶ 174.)

Despite those scheduling accommodations, on December 21, Bernstein requested that both hearings be adjourned indefinitely until some unknown date because of the pending criminal case. (Dkt. 64 ¶ 175.) On December 27, the University denied that open-ended request and reiterated that Cephus remained entitled to one advisor at the hearing, who was required to make himself or herself reasonably available for scheduling. (Dkt. 64 ¶¶ 176–77.)

On January 4, 2019, Bernstein sent Cox another letter objecting to using separate hearing committees for the two complainants and enclosed

another written statement from Cephus for the hearing committee. (Dkt. 64 ¶ 178.) The University agreed to consolidate both complainants' allegations into a single hearing. (Dkt. 64 ¶ 179.) On January 9, Attorney Jeris responded to Bernstein's January 4 letter and addressed the issues raised in it. (Dkt. 64 ¶ 181.)

In the hearing packet distributed to the committee in advance of the hearing, Cox included Cephus's written submission, his criminal motion papers, counsel's affidavit, and exhibits. (Dkt. 64 ¶ 180.) On January 10, Cox sent Cephus and Attorney Bernstein the hearing packet. (Dkt. 64 ¶ 182.) On January 11, Cephus's counsel confirmed that Attorney Kathleen Stilling would appear with Cephus at the January 15 hearing, and Cox promptly provided her the hearing packet. (Dkt. 64 ¶ 183.)

Meanwhile, Cephus's criminal counsel had received multiple rounds of discovery from the District Attorney's Office between September 2018 and January 2019. (Dkt. 64 ¶ 184.) But after September 20, counsel chose not to provide the University with any further evidentiary materials beyond Cephus's written statement dated October 6, and his January 4 written submission. (Dkt. 64 ¶ 185.)

### F. The nonacademic misconduct hearing and appeals.

The nonacademic misconduct hearing proceeded on January 15, 2019. (Dkt. 64 ¶ 186.) The hearing committee received testimony from both

complainants, Cox, Hasselbacher, and a University police detective. (Dkt. 64 ¶¶ 193, 199–200.) Through counsel, Cephus cross-examined both complainants by submitting questions to the committee, but he chose not to testify. (Dkt. 64 ¶¶ 189, 195–96.)

On January 29, 2019, the committee issued a written decision. (Dkt. 64 ¶ 204.) The committee expressly stated that it drew no adverse inference from Cephus's limited participation. (Dkt. 64 ¶ 203; 44-4:116.) Based on the evidence, the committee unanimously found Cephus responsible for third-degree sexual assault and sexual harassment as to both complainants and not responsible for second-degree sexual assault as to Complainant 2. (Dkt. 64 ¶¶ 205–07.) The committee recommended expulsion by a 2–1 vote. (Dkt. 64 ¶ 208.)

On February 12, Cephus appealed to Chancellor Blank, arguing that the process was unfair and biased because he could not fully defend himself without affecting his criminal case. (Dkt. 64 ¶ 222.) On March 13, 2019, Chancellor Blank affirmed the committee's decision and disciplinary expulsion. (Dkt. 64 ¶¶ 223–27.) The Chancellor's decision was the final institutional decision in the matter, and Cephus's expulsion from the University was effective as of the date of the decision, with campus exclusion enforced beginning March 16. (Dkt. 64 ¶ 228.)

Cephus then sought discretionary review from the Board of Regents, which denied review on June 7, 2019. (Dkt. 64 ¶¶ 232–41.)

### G. The criminal trial and petition for restoration to the University.

Cephus's five-day criminal trial took place July 29 through August 2, 2019. (Dkt. 64 ¶ 242.) The jury found him not guilty of second- and third-degree sexual assault. (Dkt. 64 ¶ 243; 51-54:1, 3.)

Four days later, on August 6, 2019, Cephus petitioned for restoration of rights under UWS § 17.18. (Dkt. 64 ¶ 253; 42 ¶¶ 21–22; 47-2:5; 42-3:2–3.) His submission spanned 242 pages and included approximately 70 video clips, which counsel represented included all video played at trial. (Dkt. 64 ¶¶ 253; 42 ¶¶ 24–25; 42-4; 51 ¶ 56; 51-46; 51-53; 60-32.)

On August 19, 2019, Chancellor Blank granted the petition and readmitted Cephus. (Dkt. 64 ¶ 266; 51-48.) She explained that substantial information had not been available during the University's earlier investigation and disciplinary proceedings, including information available to and under Cephus's control. (Dkt. 51-48:3.) Her review considered the full University record, the materials Cephus submitted with his petition, and police reports obtained by University counsel. (Dkt. 64 ¶ 267; 51-48:2–4.)

Chancellor Blank found that the newly available police reports and trial video clips materially affected the earlier third-degree sexual assault

finding. (Dkt. 64 ¶ 269; 51-48:4.) She concluded that the totality of the evidence no longer established third-degree sexual assault by a preponderance of the evidence. (Dkt. 64 ¶ 272; 51-48:4–6.) She nevertheless found that the record continued to support the finding that Cephus sexually harassed the complainants by directing Teammate 2 to photograph them without consent. (Dkt. 64 ¶ 273; 51-48:5–6.)

Because Cephus had already been suspended from March 13 to August 19, Chancellor Blank concluded that sanction sufficiently addressed the remaining violation and reinstated him effective immediately, before the academic year began. (Dkt. 51-48:6–7.)

### H. Other litigation.

In addition to the lawsuit Cephus filed in 2018, (Dkt. 64 ¶ 147; 47-33), Complainant 2 sued the University in September 2020. (Dkt. 64 ¶ 278.) Complainant 2 alleged that the University had violated Title IX by discriminating against her because of her sex and acting with deliberate indifference in response to her report of sexual assault. *Doe v. Board of Regents of the Univ. of Wis. Sys.*, 615 F. Supp. 3d 877 (W.D. Wis. 2022). The court granted summary judgment to the University and dismissed that case on July 19, 2022. *See id.* Initially this Court reversed the district court's judgment in favor of the Board, but that decision was vacated, and the matter was reheard *en banc* on February 4, 2026. *See Arana v. Bd. of Regents of Univ. of Wisconsin*

*Sys.*, 142 F.4th 992, 994 (7th Cir. 2025)*, reh'g en banc granted, opinion vacated,* No. 22-2454, 2025 WL 2726022 (7th Cir. Sept. 22, 2025). This case represents the third discrimination lawsuit arising out the incident.

## II. Procedural background.

Cephus filed this action on February 23, 2021, asserting five claims: a Title IX sex discrimination claim against the Board; two Fourteenth Amendment due process claims under 42 U.S.C. § 1983 against Chancellor Blank and Lauren Hasselbacher; and two state law claims against the Board. (Dkt. 1 ¶¶ 239–300.)

The district court dismissed the due process claims and the state law claims on December 14, 2022, and dismissed Blank and Hasselbacher from the case with prejudice. (Dkt. 25.) Cephus does not challenge those decisions on appeal. (7th Dkt. 27.) The remaining Title IX claim proceeded to summary judgment. (Dkt. 39; 41.)

On October 30, 2025, the district court granted summary judgment to the Board. (Dkt. 72.) In its opinion and order, the court first enforced its summary judgment procedures, which required parties to present evidence through proposed findings of fact and prohibited reliance on facts contained

only in briefing. (Dkt. 72:1–2; 16 (Summary Judgment Proc. §§ II.D, E).[2]) The court determined that Cephus failed to comply with those procedures by citing materials in his brief that were not included in any proposed findings of fact. (Dkt. 72:1–2.) The court, therefore, considered only evidence that Cephus "properly submitted to dispute defendants' proposed findings of fact." (Dkt. 72:2.)

The court also excluded several of Cephus's exhibits under Rule 37(c)(1) because he failed to disclose them during discovery. (Dkt. 72:3.) The excluded materials included Exhibits 2–3, 5–8, 10–15, 17–18, 22–27, and 39–46, attached to the declaration of Kristen Mohr, (Dkt. 60), that were neither produced in discovery nor set forth in any proposed finding of fact. (Dkt. 72:3.)

The court also declined to consider the declaration and deposition of Chancellor Blank in *Doe v. Board of Regents of the Univ. of Wis. Sys.*, No. 20-cv-856 (W.D. Wis.). (Dkt. 72:2–3, n.1 (citing Fed. R. Evid. 804(b)(1)(B)).)

Turning to the merits, the court rejected Cephus's Title IX claim. (Dkt. 72:4–35.) It concluded that his evidence of general campus climate did not support an inference that sex discrimination infected his disciplinary proceeding. (Dkt. 72:28–29.) It further concluded that the alleged procedural

[2] The district court served the Preliminary Pretrial Packet in cases assigned to District Judge William M. Conley via hyperlink in the text of docket entry 16. The procedures are also available at https://www.wiwd.uscourts.gov/sites/default/files/Attachments_PPTC_WMC.pdf.

irregularities reflected ordinary decisions in the disciplinary process and did not show sex-based bias. (Dkt. 72:31.)

Cephus filed his notice of appeal on November 19, 2025. (Dkt. 75.) He challenges the district court's enforcement of its summary judgment procedures, exclusion of evidence under Rule 37(c)(1), and entry of summary judgment on his Title IX claim. (7th Dkt. 27 (Appellant's Br. 1).)

## SUMMARY OF THE ARGUMENT

The district court correctly entered summary judgment because the record contains no evidence that Cephus's sex caused the outcome of his disciplinary proceeding.

First, the court acted well within its discretion in enforcing its summary judgment procedures. Those procedures required Cephus to present evidence through properly supported proposed findings of fact. He did not. Instead, he attempted to inject facts through his brief. This Court has repeatedly held that a district court may demand strict compliance with its procedures and disregard noncompliant submissions without abusing its discretion. The district court did exactly that.

Second, the district court properly excluded Cephus's undisclosed evidence under Rule 37(c)(1). Cephus failed to identify or produce most of his summary judgment evidence in discovery, offered no justification for that failure, and deprived the Board of any opportunity to test the evidence. Rule

37's exclusion sanction is "automatic and mandatory" in those circumstances. Without those exhibits, much of his appellate argument falls away.

Third, on the merits, Cephus has no evidence that his sex caused the outcome of his disciplinary proceeding. His theory rests on generalized campus pressure, alleged procedural irregularities, and the existence of parallel criminal proceedings. But Title IX prohibits discrimination on the basis of sex—not imperfect processes or difficult administrative decisions. This Court has made clear that background pressure, pro-complainant bias, and alleged procedural missteps do not support a Title IX claim unless they are tied to sex in the plaintiff's own case. Cephus identifies no such evidence.

The record instead shows that the University followed its procedures, afforded Cephus multiple opportunities to participate, and made routine, sex-neutral decisions throughout the investigation and hearing. The alleged "irregularities" either did not occur, were applied equally to both sides, or reflect ordinary discretionary judgments. Even taken together, they do not permit a reasonable inference of sex discrimination.

## ARGUMENT

### I. The district court acted well within its discretion by enforcing its local procedures and declining to consider facts presented outside the required proposed findings of fact procedure.

A district court's decision to enforce its local rules and summary judgment procedures is reviewed for abuse of discretion. *Ammons v. Aramark*

*Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004). District courts have "considerable discretion" in interpreting and applying their own procedures, and this Court will reverse only if it is "convinced that the district court made a mistake." *Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 549 (7th Cir. 2017). Consistent with that deferential standard, this Court has repeatedly held that district courts may demand strict compliance with local summary judgment procedures and disregard facts presented in violation of those procedures without abusing their discretion. *See Hedrich v. Bd. of Regents of Univ. of Wis. Sys.*, 274 F.3d 1174, 1177–78 (7th Cir. 2001); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921–22 (7th Cir. 1994) (collecting cases). The district court did exactly that here when it declined to consider facts Cephus presented only through declarations and briefing, rather than in separately filed proposed findings of fact.

Cephus had notice of the court's procedures. In its preliminary pretrial conference order, the court ordered that "all parties must follow this court's Summary Judgment Procedures" and warned that it "will not consider any document that does not comply." (Dkt. 16:3.) Those procedures required a responding party to present additional facts in a separate document, with each fact stated in a numbered paragraph supported by record citations. (Dkt. 16, Summary Judgment Proc. §§ I(B), II(B), (D), (E).) Just as explicitly, the

procedures warned that the court "will not consider facts contained only in a brief." (Dkt. 16, Summary Judgment Proc. §§ I(B)(4), II(B), (D), (E).)

Cephus ignored those requirements. He disputed almost none of the Board's proposed findings with proper citations and filed no additional proposed findings at all. (Dkt. 64.) Instead, he attempted to inject new factual assertions *only* in his brief, citing his own declaration and counsel's exhibits. (Dkt. 56:7–13, 22–33, 36–51; 58; 60; 61.) This Court's precedent instructs that a district court may disregard precisely that type of noncompliant submission. *Hedrich*, 274 F.3d at 1178.

Cephus's harmless error argument fails because it misunderstands the purpose of summary judgment procedures. He argues that he did not "force[ ] the district court to 'search the record for evidence'" because his evidence appeared in affidavits. (Appellant's Br. 24.) But *Waldridge* rejected that exact argument. 24 F.3d at 923. The required factual statements are not "mere formality" or "superfluous abstracts of the evidence"; they are the roadmap that identifies disputed facts and ties each one to specific record evidence.

*Id*. at 923–24.

Cephus never provided that roadmap. He did not translate the assertions in his declaration and exhibits into numbered proposed findings. Without that roadmap, the district court was not required to sift through the

record to identify disputes. *Waldridge*, 24 F.3d at 923–24. And without that structure, the Board was deprived of the opportunity to respond to Cephus's additional facts in separately numbered paragraphs as set forth in the district court's procedures. (Dkt. 16, Summary Judgment Proc. § III(B).) As in *Waldridge*, that omission was "not a harmless technicality, but a mistake that [this Court's] precedents (for good reason) have deemed fatal." *Id.* at 924.

Nor did Cephus meaningfully distinguish *Hedrich*. (Appellant's Br. 25–26.) There, this Court upheld a district court's decision to disregard noncompliant factual submissions because they failed to serve the procedures' core purpose—linking specific factual propositions to record evidence and allowing orderly responses. *Hedrich*, 274 F.3d at 1177–78; (Dkt. 16, Summary Judgment Proc. § III(B).). The same is true here. Cephus did not file any additional proposed findings of fact. Instead, he placed new factual assertions only in his brief, bypassing the required format entirely. (Dkt. 64; 56.)

That failure caused concrete prejudice. It deprived the Board of the opportunity to respond to proposed facts paragraph-by-paragraph and shifted to the court the burden of "scour[ing] the record looking for factual disputes." *Waldridge*, 24 F.3d at 922–23. As this Court has recognized, strict compliance with local procedures is justified by the "'district court's significant interest in maintaining the integrity of its calendar' and in 'streamlining' its caseloads."

*Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995) (citation omitted).

Cephus does not claim he lacked notice or could not comply with the summary judgment procedures. Like the appellant in *Hedrich*, he offers no reasonable excuse for his failure. 274 F.3d at 1178. As in *Hedrich*, "the sanction of exclusion was [therefore] within the district court's discretion." *Id.*

Because Cephus ignored clear procedures, failed to file any additional proposed facts, and attempted to inject additional facts only through briefing and declarations, the district court appropriately exercised its discretion in declining to consider those materials. This Court should affirm.

## II. The district court properly exercised its discretion in excluding Cephus's exhibits that he failed to disclose during discovery.

A district court's decision to exclude evidence under Rule 37(c)(1) for a party's failure to disclose it during discovery is reviewed for abuse of discretion. *David v. Caterpillar, Inc.*, 324 F.3d 851, 856 (7th Cir. 2003). Under this deferential standard, the decision stands so long as it falls within the range of reasonable options available to the court. *See Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 739 (7th Cir. 1998). Here, the district court appropriately exercised its discretion when it excluded Cephus's Exhibits 2–3, 5–8, 10–15, 17–18, 22–27, 39–46, attached to the Declaration of Kristen Mohr, (Dkt. 60),

because Cephus failed to disclose them in response to the Board's discovery requests. (Dkt. 72:3.)

Rule 37(c)(1) bars a party from using information it failed to disclose unless the failure was substantially justified or harmless. Fed. R. Civ. P. 37(c)(1). The rule's exclusion sanction is "automatic and mandatory" absent such a showing. *David*, 324 F.3d at 856–57. The district court is not required to make explicit findings about the existence of a substantial justification or harmlessness of a failure to disclose. *Id.* at 857 (citation omitted). Whether that showing has been made is entrusted to the district court's broad discretion, guided by the prejudice or surprise to the opposing party, the ability to cure any prejudice, the likelihood of disruption, and the bad faith or willfulness of the nondisclosure. *Id.*

In the district court, Cephus never made the required showing. He offered no explanation for failing to identify or produce the challenged exhibits in response to the Board's discovery requests. (Dkt. 63:9–13.)

The discovery record confirms that failure. When asked by Defendants to identify evidence supporting his claim that the University acted out of fear of federal enforcement or litigation, Cephus did not identify any of the materials he later relied on at summary judgment. (Dkt. 51 ¶ 53; 51-50:27.) Instead, he referred only vaguely to federal investigations that occurred years before his disciplinary proceeding without identifying supporting documents

or explaining how those events impacted the investigation at issue here. (Dkt. 51-50:27); *contra* Fed. R. Civ. P. 33(b)(3) (requiring a party to answer each interrogatory "fully"); 33(d) (option to produce business records by "specifying the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could.").

The same pattern repeats across the discovery record. When asked to identify evidence of media or campus pressure, Cephus again provided only conclusory statements and identified no documents. (Dkt. 51-50:28–29 (Interrog. Nos. 7, 9)); *contra* Fed. R. Civ. P. 33(b)(3), (d). When asked to identify evidence that the University treated him differently because of his sex, he again failed to identify the materials he later relied on. (Dkt. 51-50:30–31.) And when the Board requested production of all supporting documents, Cephus did not produce the media articles, emails, or other materials he later submitted as exhibits at summary judgment. (Dkt. 51-50:35–36); *contra* Fed. R. Civ. P. 34(a), (b)(2). He did not cure those omissions when given an opportunity to supplement. (Dkt. 51-51:4.)

Cephus also withheld information about his claim that the hearing committee altered his attorney-advisor's questions. He refused to provide a substantive response in discovery, invoking privilege and later claiming lack of knowledge. (Dkt. 51-50:31–32; 51-51:4–5.) At his deposition, Cephus

testified that he asserted the attorney client privilege and attorney work product privilege for information exchanged between him and his criminal lawyers and Title IX lawyers. (Dkt. 53:22 (Cephus Dep. 25:12–26:20).) He then proceeded to rely on new information at summary judgment, and he continues to rely on that same information on appeal. (Dkt. 56:40–41; Appellant's Br. 48–50.)

The Supreme Court has long held that a party cannot refuse to answer interrogatories simply because the requested information is within the knowledge of the party's attorney. *Hickman v. Tayor*, 329 U.S. 495, 504 (1947); *see also*, 8B Charles Alan Wright et al., Fed. Prac. & Proc. § 2177 (3d ed. Apr. 2026 update) (hereafter "Federal Prac. & Proc."). Similarly, a party may not use the privilege as both a shield and a sword—a shield to hide information during discovery and a sword to use it at summary judgment. *See Garcia v. Zenith Elecs. Corp.*, 58 F.3d 1171, 1175 n.1 (7th Cir. 1995) ("[T]he attorney-client privilege is generally waived when the client asserts claims or defenses that put his attorney's advice at issue in the litigation."); *Chevron Corp. v. Pennzoil Co.,* 974 F.2d 1156, 1162 (9th Cir. 1992) ("The privilege which protects attorney-client communications may not be used as both a sword and a shield."); *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991); *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 864 (3d Cir. 1994) ("A litigant cannot shield from discovery the knowledge it possessed by claiming it

has been communicated to a lawyer; nor can a litigant refuse to disclose facts simply because that information came from a lawyer”). Yet that is exactly what Cephus did.

On appeal, Cephus argues that the district court erred in excluding Exhibits 22–29 and 39–45 because *the Board* either produced those records in discovery or authored them. (Appellant’s Br. 27–28.) That argument misses the point. A party cannot evade his discovery obligations by pointing to someone else’s possession of the information. He must identify both the information contained in records available to him and the information others—including his attorneys, agents, or the opposing party—have provided that he intends to rely on in the litigation. Federal Prac. & Proc. Civ. § 2177.

Nor could Cephus satisfy that obligation by relying on the Board’s possession of its own records. Although Rule 33(d) permits a party to answer some interrogatories by producing business records, courts have rejected that shortcut for contention interrogatories, particularly when the cited records belong to the opposing party. Federal Prac. & Proc. § 2178; *United States ex rel. Landis v. Tailwind Sports Corp.*, 317 F.R.D. 592, 594 (D.D.C. 2016) (collecting cases). The reason is simple: documents may contain evidence, but they do not reveal which facts a plaintiff claims support his legal theory. *Tailwind Sports Corp.*, 317 F.R.D. at 594 (citation omitted). Only Cephus knew which records he intended to use to support his Title IX claim. Yet he did not

identify Exhibits 22–29 or 39–45 in response to the Board's contention interrogatories.

This failure to disclose was not harmless.[3] Discovery exists to allow parties to test evidence, develop rebuttal proof, and prepare their case on a complete record. *See United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958) (Discovery is intended to "make a trial less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent.") By withholding the evidence he later relied on, Cephus deprived the Board of that opportunity. The resulting prejudice is concrete.

Because Cephus failed to disclose the challenged exhibits and never justified that failure, the district court properly excluded them under Rule 37(c)(1). *See Musser v. Gentiva Health Svcs.*, 356 F.3d 751, 758 (7th Cir. 2004); (Dkt. 72:3 (excluding Dkt. 60-2–60-3; 60-5–60-8; 60-10–60-15; 60-17–60-18;

60-22–60-27; 60-39–60-46)). That evidentiary ruling falls well within the district court's discretion and has significant consequences for this appeal. Cephus's appellate merits-based arguments rely heavily on the excluded

[3] Cephus makes no argument that the district court erred in excluding Exhibits Exhibits 2–3, 5, 7–8, and 10–11. (Appellant's Br. 26–28.) To the extent he attempts to raise a new argument as to those exhibits in his reply, he has forfeited it by not raising it in his opening brief. *See United States v. Banas*, 712 F.3d 1006, 1010 n.1 (7th Cir. 2013); *Abstract & Title Guar. Co. v. Chicago Ins. Co.*, 489 F.3d 808, 812 (7th Cir. 2007).

materials. (Appellant's Br. 33 (citing Dkt. 60-12), 34 (citing Dkt. 60-2; 60-13; 60-14; 60-15), 35 (citing Dkt. 60-14), 43–44 (citing Dkt. 60-22; 60-24; 60-25), 45 (citing Dkt. 60-22–60-27), 46 (citing Dkt. 60-46), 47 (citing Dkt. 60-46; 59 ¶¶ 49–50), 48 (citing Dkt. 60-39; 60-40; 60-43).) If this Court affirms the district court's evidentiary rulings, it should disregard those materials and the arguments built on them.

## III. Cephus's Title IX claim fails because he did not present evidence of sex discrimination.

Summary judgment should be affirmed on Cephus's Title IX claim because the record contains no evidence of sex discrimination. Cephus argues that, viewing the totality of the circumstances, public pressure, and supposed procedural irregularities support an inference that the University expelled him because he is male. (Appellant's Br. 19–20, 31–51.) In his view, the criminal case left him in a "no-win" position—either participate in the University process and risk his defense or remain silent and risk expulsion. (Appellant's Br. 20.) Cephus's theory fails because he never connects the University's actions to his sex.

Title IX required the University to follow its procedures and resolve complaints promptly. 34 C.F.R. § 668.46(k); 79 Fed. Reg. 62789 (Oct. 20, 2014).[4] The existence of parallel criminal proceedings does not alter that

[4] All references to 34 C.F.R. Part 668 are to the final rule published October 20, 2014. 79 Fed. Reg. § 62783–90 (Oct. 14, 2014).

obligation. Nor does it alter the governing question: whether the evidence permits a reasonable inference that sex—not purported irregularities, parallel criminal proceedings, concern for complainants, or ordinary human error—caused the outcome. Because Cephus identifies no evidence that sex played any role in his case, summary judgment was proper. This Court should affirm.

### A. The district court's decision granting summary judgment is reviewed de novo.

The district court's grant of summary judgment is reviewed de novo. *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 584 (7th Cir. 2021). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute does not defeat summary judgment unless, if resolved in the opposing party's favor, a reasonable jury could return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *FKFJ*, 11 F.4th at 584.

In applying that standard, a court draws reasonable inferences in favor of the nonmoving party, but not "every conceivable inference." *FKFJ*, 11 F.4th at 585. The nonmoving party must present evidence—not speculation or conjecture—to create a genuine dispute. *Id*. And when the opposing party fails to establish an essential element of a claim on which it carries the burden of proof, "Rule 56(c) mandates entry of summary judgment against that party

because a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* (citation omitted).

### B. Title IX requires evidence of sex discrimination.

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "The Supreme Court has interpreted Title IX to provide individual plaintiffs with an implied private right of action to pursue claims of gender discrimination in federal court and has recognized a number of claims that constitute discrimination." *Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 854 (7th Cir. 2019).

To prove a Title IX discrimination claim, a plaintiff must show "(1) the educational institution received federal funding, (2) [the] plaintiff was excluded from participation in or denied the benefits of an educational program, and (3) the educational institution in question discriminated against [the] plaintiff based on gender." *Metzler v. Loyola Univ. Chicago*, 164 F.4th 612, 617 (7th Cir. 2026) (citation omitted). At summary judgment, the question is whether the record permits a reasonable inference that sex caused the challenged outcome. *Id.* (citation omitted). Courts assess that question by considering the totality of the circumstances and evaluating the

evidence holistically. *Gash v. Rosalind Franklin Univ.*, 117 F.4th 957, 962 (7th Cir. 2024); *Metzler*, 164 F.4th at 617 (citation omitted).

Title IX prohibits sex discrimination—not imperfect disciplinary decisions. *Metzler*, 164 F.4th at 617. Accordingly, alleged errors in an investigation or hearing—such as flawed judgments, incomplete evidence, or imperfect procedures— "are of no concern under federal law unless the defendants treated men worse than women (or the reverse)." *Id.* (quoting *Doe v. Trs. of Ind. Univ.*, 101 F.4th 485, 489 (7th Cir. 2024)). And for the same reason, "a plaintiff cannot prove gender discrimination by merely identifying mistakes or imperfections in the process." *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 793 (7th Cir. 2022).

Procedural missteps alone cannot establish sex discrimination—and neither can other sex-neutral flaws, such as anti-respondent bias. *Metzler*, 164 F.4th at 617. A challenged action that is "facially divorced from sex," or "no more suggestive of sex discrimination than . . . of lawful alternative explanations, like incompetence, impatience, or pro-complainant bias," fails to support a Title IX sex discrimination claim. *Metzler*, 164 F.4th at 617 (quoting *Gash*, 117 F.4th at 967). And "pro-victim or pro-complainant bias [ ] cannot support a claim for sex discrimination because both men and women can be victims of sexual assault." *Id.* (quoting *Gash*, 117 F.4th at 967 (citation omitted)).

Similarly, allegations of external, governmental, or campus pressure "is not enough on its own to support a claim of discrimination . . . ." *Metzler*, 164 F.4th at 618 (citation omitted). Although evidence of governmental or campus pressure may provide context, *Doe v. Purdue University*, 928 F.3d 652, 669 (7th Cir. 2019), a "plaintiff must also show evidence of discrimination 'particular to his case.'" *Metzler*, 164 F.4th at 618.

### C. Cephus's external pressure and campus climate theory fails because there is no evidence of sex bias particular to his case.

Cephus contends that rescinded federal guidance, public criticism, and campus awareness efforts created pressure on the University to favor female complainants and treat male students as likely perpetrators. (Appellant's Br. 31–34.) This background pressure, he says, in turn created an "anti-male climate on campus" at the time of his investigation. (Appellant Br. 34.) Aside from the rescinded federal guidance, the district court excluded the rest of the evidence Cephus offers to support this theory because he never disclosed it in discovery. (Dkt. 72:3 (excluding Dkt. 60-2; 60-12; 60-13; 60-14; 60-15); Appellant's Br. 32–35 (citing Dkt. 60-2; 60-12; 60-13; 60-14; 60-15).) This Court should affirm that exclusion. But even if considered, the evidence does not support an inference of sex discrimination or identify any decisionmaker who

acted on sex-based assumptions in Cephus's case. *See Trs. of Ind. Univ.*, 101 F.4th at 490.

**1. Cephus's rescinded federal guidance theory fails.**

Cephus relies on rescinded guidance from the U.S. Department of Education—the 2011 *Dear Colleague Letter* and the 2014 *Questions and Answers on Title IX and Sexual Violence* (the "2014 Q&A")—to argue that federal pressure required universities to favor complainants and rush disciplinary proceedings. (Appellant's Br. 32–33.) But rescinded federal guidance cannot support an inference of discrimination absent evidence that the University remained accountable to it. *Gash*, 117 F.4th at 963 (citation omitted).

Here the Department rescinded the Dear Colleague Letter and the 2014 Q&A on September 22, 2017, and replaced them with interim guidance—the *Q&A on Campus Sexual Misconduct* (the "2017 Q&A") along with the *Revised Sexual Harassment Guidance*, 66 Fed. Reg. 5512, Jan. 19, 2001. (Dkt. 60-9:2, 7.) The interim guidance emphasized that "[a]ny rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms." (Dkt. 60-9:5.) Seven months after the interim guidance issued, Cephus was investigated by the University. (Dkt. 64 ¶¶ 57–61.) Nothing in the record even suggests that the University

continued to follow the rescinded guidance or faced any risk of enforcement tied to it.

Cephus instead purports to quote a statement from Chancellor Blank issued the day after the rescission. (Appellant's Br. 33; Dkt. 60-12.) But that statement confirms the opposite of what he claims. It explains that the University's procedures already complied with the revised guidance and ensured equal participation rights for both parties:

> Our procedures incorporate the due process elements discussed in Friday's guidance from the Department of Education. . . . We work to ensure that our process is prompt, fair, and impartial. Both parties have equal participation rights throughout any investigation and disciplinary procedures.

(Dkt. 60-12:2.) Cephus does not identify any plausible reading of that statement that supports his theory. (Appellant's Br. 33.)

Nor does Cephus identify any way in which the University's handling of his case deviated from the 2017 Q&A. The undisputed record shows that he received notice of the allegations, multiple opportunities to respond, access to the evidence, and advance disclosure of the hearing materials. (Dkt. 64

¶¶ 58–64, 72–74, 76–84, 89–91, 97–100, 114–115, 120–121, 132, 134, 139–140, 144, 150, 182–183.) These facts undermine, rather than support, any inference that federal pressure caused the University to treat him unfairly because of his sex.

Without evidence that the rescinded guidance influenced the decisionmakers in this case, Cephus's federal pressure theory fails. *Metzler*, 164 F.4th at 618; *accord Gash*, 117 F.4th at 963.

**2. Cephus's campus climate and media pressure theory fails.**

Cephus's campus climate and media pressure theory also fails for the same reason his federal pressure theory fails: generalized background evidence cannot support an inference of sex discrimination without facts tying that atmosphere to the decisionmakers in his own case. *See Columbia Coll. Chi.*, 933 F.3d at 855.

Cephus relies on media articles, campus survey data, and a 2015 University Police Department awareness video to argue that the University viewed men as prototypical perpetrators and therefore treated him unfairly because he is male. (Appellant's Br. 18, 33–35; Dkt. 60-2; 60-13; 60-14:3; 60-15.) But this Court has already rejected that premise. A survivor-centered climate, sexual assault awareness efforts, or even evidence of pro-complainant bias does not support an inference of anti-male discrimination because both men and women may be victims. *Gash*, 117 F.4th at 967; *Metzler*, 164 F.4th at 621–22; *Columbia Coll. Chi.*, 933 F.3d at 855. Without evidence tying that background climate to the investigators, hearing committee, or decisionmakers here, no reasonable jury could infer that Cephus's sex caused the outcome.

Cephus points to two articles discussing a 2004 campus assault and characterizes them as "recent high-profile criticisms." (Appellant's Br. 34; Dkt. 60-2; 60-15.) But the articles are too remote in time and too disconnected from his 2018 investigation to support an inference of sex discrimination. One article is dated February 24, 2010, and reports on U.S. Department of Education findings issued in 2008—roughly a decade before the University investigated Cephus. (Dkt. 60-2.) The other concerns the same 2004 incident and is largely illegible. (Dkt. 60-15:3–5.) Cephus offers no explanation for how such dated material influenced the officials who decided his case.

The survey data and 2015 awareness video fail for the same reason. Cephus highlights a video stating that "more than 98% of the perpetrators were identified as men" and argues that the University therefore believed *female* complainants must be protected "at all costs." (Appellant's Br. 18,

34–35; Dkt. 60-13; 60-14:3.) But he identifies no evidence that this video's messaging affected his disciplinary proceeding. That omission alone defeats his claim. *Columbia Coll. Chi.*, 933 F.3d at 855. Nor does he show that the data were inaccurate or misleading. The only reasonable inference is that the University published prevention materials reflecting reported statistics. Reporting those statistics does not show that any decisionmaker in Cephus's case acted on sex-based assumptions. Indeed, the University was required to

report annually to the federal government on crime statistics and its programs to prevent dating violence, domestic violence, sexual assault, and stalking under 34 C.F.R. §§ 668.46(b)(1), (b)(11), (c) & (j); 79 Fed. Reg. 62785.

Nor does *Schwake v. Arizona Board of Regents*, 967 F.3d 940, 948 (9th Cir. 2020), help Cephus. There, the plaintiff relied on a concurrent federal investigation into the university's handling of sexual misconduct complaints—a direct and immediate source of pressure tied to his case. *Id.* Cephus identifies nothing comparable. He relies instead on dated articles and generalized awareness efforts that are untethered to the officials who investigated, heard, or reviewed his case. That evidence cannot support an inference of sex discrimination.

### D. The alleged procedural irregularities were not irregularities at all and Cephus never ties them to his sex.

The district court correctly concluded that Cephus's claimed procedural "irregularities" reflect ordinary decisions made during an investigation and hearing and do not show bias based on his sex. (Dkt. 72:32.) Cephus argues that the University denied him a fair process—particularly by proceeding alongside his criminal case—and that the court failed to consider the totality of the circumstances. (Appellant's Br. 37.)

Procedural errors, even if assumed, do not establish sex discrimination. *Metzler*, 164 F.4th at 617. An action "facially divorced from

sex," or equally consistent with lawful explanations such as impatience, imperfect judgment, or pro-complainant bias, cannot support a Title IX claim. *Id.*

Cephus identifies a series of alleged errors, including the University's refusal to delay the proceedings, scheduling decisions regarding the hearing, communications with complainants and their families, allowing one complainant to review the other's statement, presuming him guilty, and limits on cross-examination. (Appellant's Br. 35–49.) None of these actions, individually or collectively, is tied to Cephus's sex. The district court evaluated each allegation, considered the totality of the circumstances, and concluded that the record contains no evidence that his sex played any role in the outcome. (Dkt. 72:32.) That conclusion is correct and should be affirmed.

### 1. Proceeding during the criminal case was neither irregular nor evidence of sex discrimination.

The University's decision to proceed while Cephus's criminal case remained pending does not support an inference of sex discrimination. That decision flowed from gender-neutral legal obligations requiring a prompt and equitable resolution of sexual-misconduct complaints, not from any sex-based consideration.

Cephus argues that the University "knowingly" adjudicated his case without access to police reports, surveillance footage, and other evidence

in the district attorney's possession. (Appellant's Br. 37–38.) But the existence of unavailable evidence does not transform a decision to proceed into sex discrimination. The governing question is not whether the University could have waited. It is whether proceeding permits an inference that it acted because Cephus is male. It does not.

#### a. The University's duty to promptly resolve complaints of sexual violence is not evidence of sex discrimination.

Federal law required the University to maintain procedures that provide a "prompt, fair, and impartial" resolution of sexual-misconduct complaints.

20 U.S.C. § 1092(f)(8)(B)(iv)(I)(aa); 34 C.F.R. § 668.46(k); (Dkt. 60-9 (Q&A on Campus Sexual Misconduct, U.S. Dept. of Educ., 3 (Sept. 2017).).

Applicable federal guidance identified elements the Department of Education would evaluate to determine whether a university's grievance procedures were prompt and equitable. Those elements included whether the procedures provide for "[d]esignated and reasonably prompt timeframes for the major stages of the complaint process." *Revised Sexual Harassment Guidance*, U.S. Dept. of Educ., 20 (Jan. 2001). It also provided that "because legal standards for criminal investigations are different, police investigations or reports may not be determinative of whether harassment occurred under Title

IX and do not relieve the school of its duty to respond promptly and effectively." *Revised Sexual Harassment Guidance*, U.S. Dept. of Educ., 21 (Jan. 2001).

Consistent with those obligations, Wisconsin regulations imposed corresponding timelines for hearings and appeals. (Dkt. 64 ¶ 26; 47-2 (Wis. Admin. Code UWS §§ 17.11(4)(c)(2), 17.12(2), 17.13(2)).) Relevant here, UWS 17 required the University to schedule the misconduct hearing "within 15 days" of a written report finding the student responsible for nonacademic misconduct and recommending a sanction of expulsion. (Dkt. 47-2 (Wis. Admin. Code UWS §§ 17.11(4)(c)(2) & 17.12(2)).) It further required that "[t]he hearing shall be conducted within 45 days of the . . . written report, unless a different time period is mutually agreed upon by the respondent and investigating officer, or is ordered or permitted by the hearing examiner or committee." *Id.* Finally, it required that a student submit an appeal to the chancellor within 14 days of the hearing decision and that the chancellor decide the appeal within 30 days of that submission. (Dkt. 47-2 (Wis. Admin. Code UWS § 17.13(2)).)

The University's policy likewise required prompt and equitable resolution of complaints, and its practice was not to delay hearings beyond the prescribed timeframe without agreement from both parties. (Dkt. 64 ¶¶ 25, 161; 47-1.) That practice reflects a neutral effort to comply with governing law and treat complainants and respondents equally. 34 C.F.R. §§ 668.46(k)(2)(iv),

(3)(i)(B)(3); 79 Fed. Reg. 62789. It does not support an inference of discrimination based on Cephus's sex.

#### b. Cephus's choices about what evidence to provide to the University is not evidence of sex discrimination.

Cephus's claim that the University proceeded without key evidence ignores why that evidence was unavailable. The City of Madison Police Department and District Attorney's Office declined to disclose materials during the ongoing criminal case. (Dkt. 64 ¶¶ 85, 88, 102, 112.) The University informed Cephus of those limitations and repeatedly invited him to provide any information in his possession. (Dkt. 64 ¶¶ 64, 72, 75–77, 90–91, 105, 110–113.)

On August 30, 2018, Vice Chancellor Raymond Taffora emailed a letter to Cephus's lawyers and explained the legitimate nondiscriminatory reason for the University's inability to obtain additional evidence from the district attorney, as well as the University's duty to move forward with resolution of the nonacademic misconduct charges against Cephus: "the District Attorney's Office will not provide the [U]niversity access to any additional information until the conclusion of the criminal proceedings, and the [U]niversity could not delay resolution of this matter until the conclusion

of criminal proceedings given current Title IX guidance." (Dkt. 64 ¶ 112; 47-24:4.) This is corroborated by Assistant District Attorney Andrea Raymond's email to Taffora on August 20, 2018, in which she noted: "At this time we will not be releasing anything beyond the criminal complaint." (Dkt. 64 ¶ 102.)

Cephus, however, was entitled to receive all evidentiary materials from the District Attorney, including exculpatory evidence. Wis. Stat. § 971.23; *Brady v. Maryland*, 373 U.S. 83 (1963). Cephus could have made this information available had he chosen to do so. (Dkt. 64 ¶¶ 124, 184–185.) District courts have held there is no requirement under *Brady* that a university must obtain any potentially exculpatory evidence before an administrative disciplinary proceeding may commence. *See, e.g., Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 662 (S.D. Ohio 2016) (declining to extend *Brady* to university disciplinary proceedings and rejecting plaintiff's argument that the university had key evidence it did not disclose which limited the effectiveness of plaintiff's cross examination of a victim in a university Title IX proceeding). This Court has also recognized that there is "so far no parallel to *Brady* in civil litigation." *Millspaugh v. Cnty. Dep't of Pub. Welfare of Wabash Cnty.*, 937 F.2d 1172, 1175 n.1 (7th Cir. 1991).

Cephus controlled the evidence he chose to share. (Dkt. 64 ¶¶ 124, 184–85.) From the outset, the University invited him to submit a written statement, participate in an interview, and provide any relevant materials.

(Dkt. 64 ¶¶ 62, 64.) University officials repeated those invitations throughout the investigation. (Dkt. 64 ¶¶ 72, 76, 83, 90, 105, 109–10.) The record confirms that Cephus had access to extensive discovery from the District Attorney well before the hearing. (Dkt. 64 ¶¶ 124, 184.) Before the hearing, Cephus's attorneys received discovery from the District Attorney's Office on September 20, September 28, October 11, October 12, October 23, November 14, November 27, December 4, December 5, 2018, and January 7 and 9, 2019. (Dkt. 64 ¶ 184.) Yet after September 20, 2018, he chose not to provide additional documentation to the University beyond his statements on October 7, 2018, and January 4, 2019. (Dkt. 64 ¶¶ 140, 178–80, 185.) He had months to do so before the January 2019 hearing, but he did not.

A plaintiff cannot create a Title IX claim by withholding evidence and then faulting the process for lacking it. *See Univ. S. Ind.*, 43 F.4th at 795–96 (errors that plaintiff "invited" did not evince sex discrimination). The absence of additional evidence here reflects Cephus's own choices, not sex discrimination.

**c. Cephus offers no legal support for his position that he was "unable to provide exculpatory evidence" to the University before his acquittal.**

There is no evidence that the University's obligation to press forward despite Cephus's request for adjournment of the Title IX proceeding was in any way related to his sex. A criminal defendant can be a man or a

woman. Cephus has not identified any circumstances in which the University agreed to adjourn a misconduct hearing where a woman was a respondent merely because the woman requested adjournment based on pending criminal charges—which could arguably demonstrate sex discrimination in his case. (Dkt. 64 ¶ 203); *see Columbia Coll. Chi.*, 933 F.3d at 856.

Every court that has addressed whether parallel criminal prosecution and Fifth Amendment concerns require adjournment of university proceedings has concluded they do not. *See, e.g., Hart v. Ferris State Coll.,* 557 F. Supp. 1379, 1384 (W.D. Mich. 1983) ("A number of courts have faced this precise issue of whether postponement of a college disciplinary hearing until resolution of related criminal charges is constitutionally required; all have rejected plaintiff's argument.").[5] In *Hart*, the court found that under a university's disciplinary hearing procedure the student could elect to remain silent at the hearing and that no inference pointing to guilt could be drawn. *Id.* at 1385. Accordingly, the court held that the testimony would be voluntary and the Fifth Amendment did not apply. *Id.* The same is true here. Cox's finding letters specifically noted that he did not draw any adverse inference from

[5] It is worth noting the logic of this result. Under Cephus's theory, a university could not hold a hearing on sexual misconduct until after any criminal proceedings finished. Accusations of sexual misconduct will often result in criminal charges, almost by definition. Because criminal proceedings can take a very long time (Cephus's took over a year), there is a likelihood that the interested students will graduate before the criminal case finishes. This, of course, would obviate the need for discipline entirely, and would defeat the purpose of having sexual misconduct rules in the first place. *See, e.g., Nzuve v. Castleton State College*, 335 A.2d 321 (Vt. 1975).

Cephus's limited participation in the investigation. (Dkt. 64 ¶ 151.) The Hearing Committee's decision also noted that in deliberating and arriving at its findings and conclusions, the "Committee did not draw any adverse inference from [Cephus]'s limited ability to participate in the hearing." (Dkt. 64 ¶ 203.)

Cephus was allowed to (and did) submit written statements and other evidence of his choosing. (Dkt. 64 ¶¶ 80–81, 121, 123, 140.) He was represented by an attorney throughout the process. (Dkt. 64 ¶ 66.) The University did not make a negative inference against Cephus based on his limited participation in the investigation. (Dkt. 64 ¶¶ 151, 203.) And regardless, none of this is evidence of discrimination on the basis of sex. Nor does Cephus develop any argument explaining how these communications reflect sex-based decisionmaking. That omission is dispositive. *See Pond v. Michelin N. Am., Inc.*, 183 F.3d 592, 597 (7th Cir. 1999) ("[A]rguments raised in a conclusory or underdeveloped manner" are "waived on appeal.")

Cephus relies on *Does 1-2 v. Regents of the Univ. of Minnesota*, 999 F.3d 571, 577–79 (8th Cir. 2021), to argue that sex discrimination need not be the only plausible explanation where over 98% of assault perpetrators are male and there is evidence of pro-complainant bias. (Appellant's Br. 41.) That case is distinguishable, as it involved detailed, case-specific allegations tying external pressure directly to the plaintiffs' disciplinary proceeding. *Does 1-2*,

999 F.3d at 578–79. The plaintiffs alleged a recent federal investigation into the university's treatment of female athletes, public statements by an investigator suggesting bias against football players, and leadership comments that players should be suspended "because of optics." *Id.* at 578–79. Those allegations—accepted as true at the pleading stage—were sufficient to survive a motion to dismiss. *Id.* at 579. Cephus, by contrast, was decided at summary judgment and offers no comparable evidence that any University official's decision to move forward during the criminal case turned on his sex rather than the University's obligation to promptly resolve the complaints and his own strategic choice to withhold evidence.

Cephus also argues that the district court imposed a heightened burden by requiring a comparator. (Appellant's Br. 42.) It did not. The court simply recognized that nothing in the record connects the denial of Cephus's request to adjourn the proceedings to sex discrimination. (Dkt. 72:32.) Although Title IX does not require an identically situated comparator in every case, Cephus cannot rely on comparisons that say nothing about sex-based treatment. *See e.g., Columbia Coll. Chi.*, 933 F.3d at 856 ("[T]his allegation is divorced from gender—[male respondent] does not allege that females accused of sexual assault were allowed to review materials or that only female victims were allowed to review them."). Without evidence bridging his complaints

about the process to sex, his claim fails as a matter of law. *Metzler*, 164 F.4th at 619.

### 2. The University scheduled the hearing to accommodate Cephus's chose advisor and did not deny his participation.

Cephus argues that the University "wrongly denied" him the right to have his chosen advisor present at the hearing. (Appellant's Br. 42.) The record shows the opposite. The University repeatedly attempted to schedule the hearing around counsel's availability and did not deny Cephus his chosen advisor.

The University began coordinating with Cephus's counsel on October 31, 2018, to schedule the hearing. (Dkt. 64 ¶¶ 160–71.) After delays in responding, counsel requested that the hearing be postponed until after the New Year. (Dkt. 64 ¶¶ 160–70.) The University granted that request, even though the governing procedures contemplated a hearing within 45 days. (Dkt. 64 ¶¶ 150, 162, 165–66.)

The University then proposed multiple January dates and asked counsel to confirm availability, including January 14–16 and 18, 2019. (Dkt. 64 ¶¶ 166, 169–70.) Counsel did not respond. (Dkt. 64 ¶¶ 169–70.) When the University scheduled hearings for January 14 and 18, counsel identified

conflicts—but not on January 15. (Dkt. 64 ¶¶ 171–72.) The University again accommodated counsel by moving the hearing to January 15. (Dkt. 64 ¶ 174.)

Counsel remained dissatisfied and renewed a request to postpone the hearing indefinitely pending the criminal case. (Dkt. 64 ¶ 175.) The University denied that open-ended request, citing its obligation to promptly resolve the complaint and that it had already spent nearly *two months* trying to accommodate counsel's schedule. (Dkt. 64 ¶ 176; 50-3:2–3.) Days before the hearing, Cephus informed the University that a different attorney would appear. (Dkt. 64 ¶ 183.)

This chronology does not show that the University denied Cephus his chosen advisor. It shows that the University repeatedly adjusted the schedule, extended the administrative deadline, and attempted to accommodate counsel—while counsel failed to identify a workable date and continued to seek indefinite delay. Cephus's attorneys never identified a date on which they would actually be available. Instead, they repeatedly rejected proposed dates—sometimes after long silences—and then renewed the same request to postpone the hearing until after the criminal trial. This was not procedural error at all. *See Univ. of S. Ind.*, 43 F.4th at 794 (scheduling a hearing four months after notice of charges was provided was not a procedural error at all where respondent and his lawyer "had ample notice of Jane's

accusations and ample time to prepare for the hearing, especially after receiving the investigator's report").

Nor does any of this support an inference of sex discrimination. Cephus identifies no evidence that scheduling decisions turned on sex—no comparator, no statement, and no policy suggesting differential treatment. At most, the record reflects routine administrative effort to coordinate participants and comply with promptness requirements. That is facially divorced from Cephus's sex and cannot support a Title IX claim. *See Gash*, 117 F.4th at 967.

**3. The University did not "bow" to pressure from complainants and instead made accommodations for both sides.**

Cephus argues that the University refused to adjourn the proceedings to appease pressure from the complainants and their families. (Appellant's

Br. 43–46.) The emails he cites do not support that claim.

Those communications are statements from third parties—not from University decisionmakers—and therefore shed little light on why the University acted as it did. (Dkt. 60-22–60-27.) To support a Title IX claim, Cephus must do more than show that pressure existed. He must show that it caused the University to act because of his sex. *Metzler*, 164 F.4th at 619. He does not.

Nothing in the emails invokes sex or suggests that the University should treat the parties differently because the complainants are female and he is male. (Dkt. 60-22–60-27.) Nor does Cephus develop any argument explaining how these communications reflect sex-based decisionmaking. That omission is dispositive. *See Pond,* 183 F.3d at 597 ("[A]rguments raised in a conclusory or underdeveloped manner" are "waived on appeal.").

The emails also undermine his theory. They show that the complainants and their families repeatedly pressed the University about delays in the process. (Dkt. 60-22–60-25.) For example, Complainant 1's father complained that the investigation was "being purposefully delayed for the benefit of Respondents." (Dkt. 47-6:3.) That evidence cuts against any claim that the University discriminated against Cephus by moving too quickly. At most, it shows that both sides were dissatisfied with the pace of the proceedings, not evidence of discrimination.

Cephus's reliance on two emails from Hasselbacher fares no better. (Appellant's Br. 44–45; Dkt. 60-26; 60-27.) The first, sent on May 18, before the investigation began, reflects uncertainty about whether sufficient information existed to initiate the process. (Dkt. 60-26:2; Dkt. 64 ¶¶ 48, 58.) That correspondence differs in kind from Hasselbacher's later communications with Cephus because the formal investigation had not yet begun. (Dkt. 64 ¶ 58.) At that point, the federal prompt-investigation requirements had not yet

attached. *See* 34 C.F.R. § 668.46(k)(2)(i) (requiring promptness starting "from the initial investigation"). Once the investigation commenced and the University learned that police materials would not be available, it offered the complainants the opportunity to be interviewed without access to the reports—the same opportunity offered to Cephus. (Dkt. 64 ¶¶ 89–91, 95–99; 47-6:3; 47-31:5 n.10.) The second email confirms that there was no fixed deadline for submitting materials during the investigation—something the University also communicated to Cephus: "Quintez can provide information relevant to the investigation at any time." (Dkt. 60-27:2; 64 ¶ 76; 47-3:5.) Neither email shows that the University afforded the complainants a benefit it denied him.

In short, Cephus identifies no evidence that the University's decisions were driven by pressure tied to his sex. At most, the record reflects ordinary communications from interested parties and routine efforts by the University to manage competing demands. That is not discrimination under Title IX.

#### 4. Allowing Complainant 2 to review Complainant 1's statement was not sex discrimination.

Cephus next argues that Hasselbacher improperly allowed the complainants to corroborate their story, citing two emails she sent to Complainant 1's father and Complainant 2's support person. (Appellant's Br. 46–47.) Neither establishes sex discrimination or bias against men.

The first email reflects routine coordination at the outset of the matter. (Dkt. 61-13:2.) Hasselbacher asked Complainant 1's father whether Complainant 1 wished to coordinate communications regarding how to proceed with a potential investigation. (Dkt. 61-13:2.) Given that the complainants were involved in the same incident and that federal law required the University to protect student privacy, this communication ensured that any information-sharing occurred with appropriate consent. (Dkt. 64 ¶ 52); 20 U.S.C. § 1232g; 34 C.F.R. §§ 99.31(a)(11), 99.37. It does not suggest bias or unfairness against Cephus.

The second email likewise reflects a case-specific, neutral decision. Complainant 2 reported that she believed she had been sexually assaulted but had no independent recollection of the events. (Dkt. 64 ¶ 53.) With Complainant 1's permission, Hasselbacher shared Complainant 1's statement with Complainant 2's support person to determine whether the allegations involved the same incident and how Complainant 2 wished to proceed. (Dkt. 64 ¶¶ 52–54.) That information was used to initiate the investigation and issue the notice of charge. (Dkt. 64 ¶¶ 52–54.)

Even assuming this approach were imperfect, it was not one-sided. The record shows that the University also allowed Cephus to review witness statements before submitting his own. Teammate 2 provided a statement on September 11, 2018, and the University shared it with all parties the next day.

(Dkt. 64 ¶¶ 117, 119–120.) Cephus had the opportunity to review that statement before submitting his own statement on September 13. (Dkt. 64 ¶¶ 120–121.) When Teammate 2 submitted an additional statement on September 26, the University again provided it to Cephus before he submitted a further response on October 6. (Dkt. 64 ¶¶ 137, 139–140, 185.)

This record shows parallel access to information, not preferential treatment. Cephus identifies no evidence that these decisions turned on his sex. Without such a link, his claim fails as a matter of law. *See Metzler*, 164 F.4th at 619.

#### 5. Cephus has no evidence the University presumed him guilty.

Cephus argues that the University "did not treat him fairly and impartially" and instead "presumed him guilty." (Appellant's Br. 47–48.) The materials he cites do not support that claim and are not tied to his sex.

First, Cephus points to the inclusion of the criminal complaint in the investigative materials and Cox's reference to it at the hearing, while his motion to dismiss was not included in the final investigative report. (Appellant's Br. 47.) But the record shows that the hearing decisionmakers received both. The University included Cephus's written submissions, motion to dismiss, supporting affidavit, and exhibits in the hearing packet distributed

before the hearing. (Dkt. 64 ¶¶ 178, 180, 182–83.) Thus, even if there were an earlier omission, it was cured before the hearing and did not prejudice Cephus.

Second, Cephus relies on a form communication from Hasselbacher and an email from a Dean of Students staff member assisting a complainant in seeking academic accommodations. (Appellant's Br. 48; Dkt. 60-39; 60-40.) Those materials concern student support services, not the nonacademic misconduct *proceeding*. (Dkt. 60-39; 60-40.) Federal regulations at the time defined "proceeding" to specifically "not include communications and meetings between officials and victims concerning accommodations or protective measures to be provided to a victim." 34 C.F.R. § 668.46(k)(iii), 79 Fed. Reg. 62789. The regulations also *required* the University to "make such accommodations or provide such protective measures if the victim requests them and if they are reasonably available[.]" 34 C.F.R. § 668.46(b)(11)(v), 79 Fed. Reg. 62785. The Dean of Students Office provided the required assistance to students affected by sexual misconduct and was available to both complainants and respondents. (Dkt. 64 ¶¶ 13–14, 34–35.) Cephus was informed that he could seek the same support. (Dkt. 53 (Cephus Dep. 28:2–16).) There is no evidence that these communications affected the nonacademic misconduct proceeding.

Third, Cephus points to an email in which Cox inquired about his prior disciplinary record. (Appellant's Br. 48.) But Cox sent that email more

than a month after issuing his initial determination. (Dkt. 64 ¶ 150.) Cephus identifies no evidence that the information was used at the hearing or considered by the decisionmakers. (Dkt. 64 ¶¶ 186–208.) It therefore could not have influenced the outcome. Even if it did, it does not show sex discrimination.

Taken together, this evidence does not show that the University pre-judged Cephus. It shows routine investigative steps, provision of student support, and immaterial inquiries. None is tied to sex, and none supports an inference that the University acted because Cephus is male. *See Trs. Of Ind. Univ.*, 101 F.4th at 490 (citation omitted) ("The core question under Title IX is whether the people who resolved Roe's grievances 'acted at least partly on the basis of sex in [this] particular case.'").

**6. Cephus was not denied the opportunity to cross examine the complainants.**

As to the last of the alleged procedural errors, Cephus contends the University unduly influenced the outcome of his disciplinary hearing by denying him the opportunity to cross examine the complainants at the hearing. (Appellant's Br. 48–49.) Specifically, he asserts that his attorney's questions were filtered through the hearing committee chairperson, who materially altered them. This, he says, violated his alleged administrative right to question adverse witnesses under UWS § 17.12(4)(b). (Appellant's Br. 49.) This argument fails for two independent reasons.

First, the procedure itself was neutral and applied equally to complainants and respondents. The University informed Cephus—by letter on January 9, 2019—that all cross-examination would be routed through the hearing committee chair. (Dkt. 50-7:3.) The University explained that its decision to require counsel to question complainants through the chair complied with UWS 17 and did not amount to a procedural irregularity. (Dkt. 44-5:120 (citing Wis. Admin. Code UWS § 17.12(4)(c)(3) (authorizing the committee to maintain order and adopt appropriate witness-questioning procedures).) Had Cephus testified, the same process would have governed questions posed to him. That uniform procedure cannot support an inference of sex-discrimination claim. *See Univ. S. Ind.*, 43 F.4th at 794 (rejecting procedural irregularities that were "not errors at all" or "applied equally to both" respondent and complainant); *Gash*, 117 F.4th at 966 (affirming judgment in favor of university despite the university's decision to remove both parties from the hearing during witness presentations).

Second, Cephus identifies no evidence that his questions were materially altered. Cephus asserts that his counsel, intended to ask Complainant 1 "whether she had a blood alcohol test done at any point when the nurses came in to give her medication." (Dkt. 56:40.) But the transcript he cites contains no such statement from Cephus's attorney (Ms. Stilling) to the hearing committee chair (Mr. Conover):

Mr. Conover: . . . [C]ould you estimate how much you think you -- you ended up sleeping between 4:15 and 9:45 a.m.?

Complainant 1: You know, I'm not sure. I know that I had an advocate in the room with me, so she might know better than I. The only reason I really know all of the -- all of what happened when I was at the hospital is from what I was told. I really don't have a strong recollection of the hospital.

Mr. Conover: Okay.

Ms. Stilling: I've never seen this.

Mr. Conover: Sorry. Did you have questions besides that?

Ms. Stilling: Well, maybe about the nurses were coming in to give you medication and they did tests.

Mr. Conover: Okay. I know your -- your recollection of the hospital is -- is fuzzy.

Do you recall interacting with any nurses or receiving medication or anything to that effect?

((Dkt. 60-36:2–3 (Tr. 131:16–132:11).) Attorney Stilling said *nothing* about blood alcohol test, and Conover's statement that he knew Complainant 1's memory was "fuzzy" was directly responsive to what Complainant 1 had just testified, "I really don't have a strong recollection of the hospital." (Dkt. 60-36 (Tr. 131:19–132:11).) The evidence therefore does not support Cephus's argument that the committee chair materially altered his questions, and he cites no further examples.

In any event, even if routing questions through the chair or modifying phrasing were imperfect, Cephus offers no evidence that any such action was tied to his sex. At most, the record reflects a neutral procedure used to manage the hearing. That is "no more suggestive of sex discrimination than

. . . lawful alternative explanations" and cannot support a Title IX claim. *Gash*, 117 F.4th at 967.

**7. The totality of the circumstances fails to show sex discrimination.**

Cephus argues that the district court failed to consider the totality of the circumstances and instead evaluated each alleged irregularity in isolation. (Appellant's Br. 50.) Not so. The district court expressly recognized that the "ultimate inquiry must consider the totality of the circumstances." (Dkt. 72:24 (citation omitted).) After addressing each of Cephus's arguments, the court concluded that none—individually or collectively—"begin to show bias against him *because of his sex*." (Dkt. 72:31.) The court concluded, "even if the investigation, hearing, and disciplinary decisions were imperfect, plaintiff has failed to show that they were so flawed as to deny him due process, much less so flawed that they were the product of any anti-male bias." (Dkt. 72:35.) Accordingly, after considering the totality of the evidence and circumstances, the court correctly held that Cephus had "failed to show he was discriminated against on the basis of his sex in violation of Title IX, and defendants are entitled to summary judgment." (Dkt. 72:35.)

Cephus argues the district court treated the public and campus pressure as separate from the rest of the evidence, and he quotes three passages from the court's decision that he claims show a failure to aggregate

the evidence. In those passages, the district court (1) agreed that the University may have erred by permitting Complainant 2 to review Complainant 1's statement; (2) noted Cephus did not connect Hasselbacher's failure to obtain evidence from the district attorney or the police reports with sex discrimination; and (3) concluded Cox's refusal to reschedule the hearing again was not evidence of sex discrimination. (Appellant's Br. 51.) Read together—as the court did—this evidence still reflects background pressure untethered to decisionmakers, routine procedural decisions, and alleged errors that are either unsupported or facially divorced from sex.

The undisputed evidentiary record undermines any inference of sex discrimination. Cephus received notice of the charges and governing procedures, access to investigative materials, the opportunity to present evidence and written submissions, and the ability to submit questions for the complainants at the hearing. (Dkt. 64 ¶¶ 114–15, 120–21, 132, 134, 139–40, 144, 150, 182–83, 189.) That process, even if not perfect, does not support an inference of sex-based decisionmaking. *See Columbia Coll. Chi.*, 933 F.3d at 856 (holding plaintiff failed to allege plausible claim of sex discrimination where plaintiff "was provided with the opportunity to review the investigative materials; was given multiple opportunities to submit evidence; presented affidavits signed by witnesses; and submitted questions to be asked of [complainant] on cross-examination").

This Court's decision in *Metzler* reinforces that conclusion. There, the plaintiff identified more concrete alleged defects—such as ignoring exculpatory evidence *in the university's possession* and failing to interview respondent's known witnesses—yet this Court affirmed because those issues were not tied to sex. 164 F.4th at 619–21. The same is true here, with less. Cephus identifies routine scheduling decisions, ordinary investigative choices, and alleged errors that either did not occur or applied equally to both sides. None supports an inference that the University acted because he is male.

## CONCLUSION

Defendants-Appellees respectfully request that this Court affirm the district court's judgment in full.

Dated this 2nd day of July 2026.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

Electronically signed by:

s/ Rachel L. Bachhuber
RACHEL L. BACHHUBER
Assistant Attorney General
State Bar #1052533

Attorneys for Defendants-Appellees

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0188
(608) 294-2907 (Fax)
rachel.bachhuber@wisdoj.gov

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), typeface requirements of Fed. R. App. P. 32(a)(5), and type style requirements of Fed. R. App. P. 32(a)(6).

> This brief contains 13,647 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 13 point Century Schoolbook.

Dated this 2nd day of July 2026.

Electronically signed by:

s/ Rachel L. Bachhuber
RACHEL L. BACHHUBER

## CERTIFICATE OF SERVICE

I certify that on July 2, 2026, I electronically filed the foregoing Brief of Defendants-Appellees with the clerk of court using the CM/ECF system, which will accomplish electronic notice and service for all participants who are registered CM/ECF users.

Dated this 2nd day of July 2026.

Electronically signed by:

s/ Rachel L. Bachhuber
RACHEL L. BACHHUBER